CYNTHIA HAMPTON,                          )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )
                                          )               ORDER
CHARLOTTE-MECKLENBURG BOARD OF            )
EDUCATION                                 )
                                          )
                    Defendant.            )
                                          )
_____ )

**THIS MATTER** comes before the Court upon Defendant Charlotte-Mecklenburg Board of Education's ("CMS") Motion for Summary Judgment, (Doc. No. 28); Plaintiff's Response in Opposition, (Doc. No. 32); Defendant's Reply, (Doc. No. 33); and the parties' supporting exhibits. For the reasons set forth below, Defendant's Motion for Summary Judgment is **DENIED**.

## I.     BACKGROUND

Read in the light most favorable to the non-moving party, the record establishes the following:

Defendant CMS hired Plaintiff Cynthia Hampton ("Hampton") as an academic facilitator at Reid Park Academy in Charlotte, North Carolina, starting in the 2013 – 2014 school year. (Doc. No. 31 Ex. 6, Depo. Ex. at 1). An academic facilitator is similar to a classroom teacher with coaching responsibilities. (Doc. No. 32-1 Ex. 1, Johnson Aff. ¶ 6). During October of the 2016 – 2017 school year, Plaintiff suffered injuries at the school when she was kicked by a student while she was attempting to

1

break up a student fight. (Id. at ¶ 7). Plaintiff was treated for injuries to her ribs, neck, and back, as well as joint stiffness. (Doc. No. 28-3 Pl. Dep. at 56, 123). Plaintiff remained out of work for several days following treatment before rejoining the school. (Doc. No 32-1 Ex. 1, CMS0176; Ex. 4, Johnson Dep. at 12–16). Upon her return to Reid Park, Plaintiff: a) remained without a walkie-talkie that she had used in previous years to communicate with school administrators, b) was required to substitute-teach on many days, and c) was required to arrive earlier than normal to perform other unassigned duties in addition to her normal duties. (Doc. No. 28-3 Ex. 3, Pl. Dep. at 182–83).

On December 15, 2016, Plaintiff notified Chaunel Johnson, Director of Employee Relations at CMS, regarding the issues Plaintiff faced at Reid Park. (Doc. No. 31-4 Ex. 4 at 107, CMS0180). Plaintiff took accrued leave and visited her physician, Dr. Joseph Davis, in December 2016. (Doc. No. 32-5 at ¶ 2). Dr. Davis subsequently diagnosed Plaintiff with Situational Anxiety Disorder and provided the CMS Benefits Department with his certification of the diagnosis. (Id. ¶¶ 2, 7, 10). Plaintiff was placed on short-term disability leave for the remainder of the school year. (Id. ¶ 2).

On August 24, 2016, Dr. Davis re-evaluated Plaintiff and determined that she could return to work. (Doc. 31 Ex. 4 at 15, CMS0175). However, Dr. Davis advised in his letter to CMS that "it is best for [Plaintiff] not to return to Reid Park [Academy], as the work environment at this school is not appropriate for [Plaintiff] because it can cause [Plaintiff's] medical condition to worsen." (Id.). CMS had positions available at

schools other than Reid Park for which Plaintiff was otherwise qualified. (Doc. No. 28-4 at 15). However, upon receipt of Dr. Davis' note, Johnson e-mailed Plaintiff seeking to understand why Plaintiff could not work at Reid Park, and informed Plaintiff that, "[i]f a workplace accommodation is to be considered, it will be in your current role [at Reid Park]." (Doc. No. 31 Ex. 1, Affidavit of Johnson ¶ 9; Ex. 6 at 4).

On September 12, 2017, Johnson informed Plaintiff that "if you require a workplace accommodation to perform the essential functions of your role as a Middle School Academic Facilitator, we will need Dr. Davis to provide his medical opinion for the basis of the recommendation." (Doc. No. 31 Ex. 1 at 22). Plaintiff then obtained a second directive from her physician reiterating that Plaintiff should not be assigned to Reid Park and that "documentation has been submitted monthly since February 2017, which describes the disabling illness (principal cause impact of normal work activity, diagnosis, causing or contributing) on form 703." (Doc. No. 31 Ex. 4, Deposition Exhibits at 9). Plaintiff also provided Johnson with a HIPPA release so that CMS could communicate with Plaintiff's medical providers. (Id. at 11–12). On September 26, 2017, Johnson faxed the signed HIPPA release form and a letter requesting additional medical information to Dr. Davis' office. Dr. Davis' never responded to Johnson's specific questions. (Id. at 13). However, Dr. Davis did respond that it is "ok for patient to return to work on November 8 [, 2017,] however she should not return to Reid Park [Academy]. The environment at this facility is detrimental to her overall health and a relapse is highly anticipated if she returns to the school." (Doc. No. 32-4, Affidavit of Joseph Davis, MD, at 15). Johnson contends that the

information contained in Plaintiff's short-term disability documents (Form 703) did not assist with the workplace accommodation analysis because the information was too general. (Id. at 12–13).

Plaintiff was scheduled to meet with Johnson on November 2, 2017. (Doc. No. 28-4, Johnson Dep. at 38). However, upon her arrival in the parking lot that day, Plaintiff experienced a panic attack and was unable to attend the meeting. (Id. at 39). On November 6, 2017, Johnson stated that Plaintiff was to resume her role as Academic Facilitator at Reid Park, and directed Plaintiff to attend a November 8, 2017 meeting at the school. (Doc. No. 32 Ex. 5 ¶ 12). Upon learning of her expected return to Reid Park, Plaintiff's sleep disorder returned, her anxiety worsened, she began experiencing "obsessive thoughts," and when she left for Reid Park on November 8 she backed her car into a pole. (Id. at ¶ 14). Upon arrival, Plaintiff experienced another panic attack, was transported to a psychiatric emergency room by a friend, and did not report to work at Reid Park. (Doc. No. 32 Ex. 10 at 7). The following day, Plaintiff notified Reid Park's principal and Johnson that she would not be at Reid Park due to her recent panic attack, hospitalization, and follow-up doctor's appointment. (Doc. No. 31 Ex. 1 at 7, CMS0132). Between November 9 and November 17, Plaintiff notified Reid Park principal and Johnson a total of six times of her absences from Reid Park due to her ongoing medical conditions. (Id. at 43–48).

Plaintiff was assigned no duties until November 17, 2017, (Doc. No. 28-3, Pl. Dep at 109–110), at which point CMS assigned her to substitute teach business education at Whitewater Middle School for ten days beginning on November 20, 2017.

4

(Id.). Johnson also informed Plaintiff that they would need to meet at her office on November 27, 2017, to discuss further accommodations. (Id. at 110). Upon arrival at their scheduled meeting to discuss Plaintiff's accommodations, the two parties were joined by Reid Park's principal and the CMS Learning Community Superintendent without prior notice. (Id. at 111). As the meeting and questioning began, Plaintiff's medical condition and anxiety resurfaced. (Id. at 111–112). Plaintiff returned to her car to retrieve medicine, whereupon she became disoriented and manic. (Doc. No. 32-4: Affidavit of Joseph Davis, MD, at 16). Plaintiff contacted a friend who took her to the Atrium Emergency Room where she was evaluated for an anxiety attack. (Id.). The following day Plaintiff informed Johnson of the events and provided her with the documentation from her medical providers. (Doc. No. 28 Ex. 1, CMS0526).

Following the November 27, 2017 event, Plaintiff was treated by Dr. Ann Richardson at Billingsley Behavioral Health Center and was instructed not to return to work until December 13, 2017. (Doc. No. 31 Ex. 6, Deposition Exhibits at 37). On January 2, 2018, Plaintiff provided to Johnson a medical exemption excusing her from work until a neuropsychological evaluation was completed. (Id. at 55). Plaintiff also notified Johnson that she was recording her absences in the CMS Program and requested confirmation that this was the proper protocol. (Id.). On February 27, 2018, Plaintiff sent Johnson an email to "keep[] in touch[,]" notifying Johnson of her follow up appointment on March 7, 2018 with Billingsley Psychiatric Center and that she would update Johnson regarding her return to work pending doctor approval. (Id. at 57). Johnson responded three hours later acknowledging Dr. Davis' multiple

certifications and reiterating her request for Dr. Davis to answer her specific questions regarding the basis of Plaintiff's inability to work at Reid Park. (Id. at 59). Johnson also claimed that Plaintiff had not recorded her absences beginning on January 22, 2018, and notified Plaintiff that her "job protections have been exhausted and your position at Reid Park remains vacant." (Id.). On February 27, 2018, Plaintiff filed her first Equal Employment Opportunity Commission ("EEOC") Charge alleging failure to accommodate and retaliation, and received a "Notice of Right to Sue" letter. (Id. at 63).

On March 7, 2018, Plaintiff received a new return-to-work release and provided it to Johnson. (Doc. No. 31-4 at 71). On April 4, 2018, Plaintiff received a letter from a CMS Benefits Office supervisor, Melissa Dahmer, claiming that CMS had not received medical documentation substantiating a non-FMLA leave from Plaintiff's doctors and that Plaintiff was on an unapproved leave of absence. (Doc. 31-1, Affidavit of Johnson at 6). Additionally, the letter instructed Plaintiff to once again return to work on April 9, 2018.[1] Ten days later, Plaintiff received an e-mail from another CMS employee, T.J. Meggett, informing her that a transfer period was set to begin on April 19 and that "the HR Team Lead from the Beacon Learning Center" would be "actively seeking" her an assignment for the 2018-19 school year. (Doc. No. 31 Ex. 6, Deposition Exhibits at 67). Shortly thereafter, on May 8, 2018, Plaintiff received a notice from CMS payroll that she had been "overpaid" in April even though

---

[1] Dahmer's letter to Plaintiff does not specify a return to Reid Park Academy. However, Plaintiff had not received any assignment outside of Reid Park Academy other than her 10-day substitute teacher role the previous year.

6

she had not received any pay from CMS since January 18, 2018. (Id. at 94).

On May 16, 2018 Plaintiff received, via hand-delivery, a letter advising her that her contract for the 2018-2019 school year would not be renewed. (Doc. No. 31-1, Affidavit of Johnson at 29). CMS's stated reason for the non-renewal of Plaintiff's contract was simply "misconduct."[2] (Id.). The letter notified Plaintiff that she was entitled to petition the Board for a discretionary hearing regarding the superintendent's non-renewal recommendation. (Id.). Through her attorney, Plaintiff subsequently requested a hearing before the CMS Board. However, the request was denied, and Plaintiff was terminated at the end of the 2017-2018 school year. (Doc. No. 31-1 at 29). On November 8, 2018, Plaintiff filed her second EEOC Charge and received another "Notice of Right to Sue" letter. (Doc. No. 9 Ex. 2 at 1).

Plaintiff filed the instant suit on June 3, 2019, in the Superior Court for Mecklenburg County, North Carolina, alleging three causes of action: (1) state law wrongful discharge, in violation of N.C. Gen. Stat. § 143-422.2 (2) failure to accommodate under the Americans with Disabilities Act ("ADA"), in violation of 42 U.S.C. § 12101, et seq.; and (3) discrimination on account of Plaintiff's disabling condition and in retaliation for Plaintiff's initial EEOC charge, in violation of 42 U.S.C. § 12112(a), 42 U.S.C. § 12112(b)(5)(B), and 42 U.S.C. § 12203. (Doc. No. 9: Amended Complaint ¶¶ 34-39). Plaintiff seeks (1) back pay and compensatory damages in excess of $20,000; (2) attorney fees and costs under 42 U.S.C. § 12205; (3)

---

[2] While CMS' letter of non-renewal to Plaintiff only stated "misconduct[,]" CMS's pleadings stated "misconduct and job abandonment[.]" (Doc. No. 31-1: Exhibit 1, CMS0536)

interest on the judgment at the statutory rate; and (4) any further relief the Court deems just and necessary. Due to the joinder of federal and state law claims, Defendant removed the entire action under 28 U.S.C. §§ 1331 and 1441(a). This Court has supplemental jurisdiction over Plaintiff's state law cause of action pursuant to 28 U.S.C. § 1367.

On February 29, 2020, Defendant filed a Motion to Dismiss Plaintiff's state law wrongful discharge claim because Defendant is entitled to governmental immunity (N.C. Gen. Stat. § 115C-42), and Plaintiff failed to allege waiver of immunity by the purchase of insurance. (Doc. No. 13). Plaintiff, with Defendant joining, subsequently filed a Stipulation of Dismal to her state law claim for wrongful discharge. (Doc. No. 14).

On March 30, 2021, Defendant filed its Motion for Summary Judgment, (Docs. Nos. 30-31), under seal. Having been fully briefed, the motion is ripe for adjudication.

## II.   STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." Id. at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. Id. at 249-50.

## III. DISCUSSION

Defendant seeks to dismiss Plaintiff's claims for Discrimination, Retaliation, and Failure to Accommodate. Each such argument will be addressed in turn.

9

## A. Discrimination Claim

Pursuant to the ADA, no employer shall discriminate against a qualified individual on the basis of their disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). To establish a claim for disability discrimination under the ADA, a Plaintiff must prove "(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability." EEOC v. Stowe-Pharr Mills, Inc., 216 F.3d 373, 377 (4th Cir. 2000). Disability discrimination may be proven through direct and indirect evidence, or through the McDonnell Douglas burden-shifting framework. See Raytheon Co. v. Hernandez, 540 U.S. 44, 49-50 (2003); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), holding modified by Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993); see also Rhoads v. F.D.I.C., 257 F.3d 373, 391 (4th Cir. 2001).

While a complaining party may rely upon circumstantial evidence to support a disability discrimination claim, the Fourth Circuit Court of Appeals has approved the use of the McDonnel Douglas burden-shifting framework. Id. Under this framework, a plaintiff seeking recovery pursuant to the ADA must first establish a *prima facie* case of discrimination. Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001). Once the plaintiff establishes a *prima facie* case, the burden shifts

to the employer to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000). Assuming the employer meets this burden of production, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons "were not its true reasons but were a pretext for discrimination." Id. at 143. The plaintiff always bears the ultimate burden of persuading the trier of fact that she was the victim of retaliation or discrimination. Haulbrook, 252 F.3d at 702.

## 1. First Element: Whether Plaintiff Has an ADA Disability

Defendant argues that Plaintiff does not have a disability as a matter of law. "Disability" is defined by the ADA as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). The ADA provides a non-exhaustive list of major life activities, including "speaking," "concentrating," "communicating," "thinking," and "working." Id. § 12102(2)(A). The EEOC has also identified "interacting with others" as a major life activity. 29 C.F.R. § 1630.2(i)(1)(i). "In September 2008, Congress broadened the definition of 'disability' by enacting the ADA Amendments Act of 2008 ["ADAAA"], Pub.L. No. 110-325, 122 Stat. 3553 . . . ." Summers v. Altarum Inst., Corp., 740 F.3d 325, 329 (4th Cir. 2014). The ADAAA was intended to make it "easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). The regulation clarifies that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." Id. "[T]he question of whether an individual's impairment is a disability under the ADA should

11

not demand extensive analysis." Pub.L. No. 110-325, § 2(b)(5) (2008). In enacting the ADAAA, Congress abrogated earlier inconsistent caselaw. <u>Summers</u>, 740 F.3d. at 331.

In the instant matter, Plaintiff alleges that her situational anxiety disorder, accompanied by sleeplessness and fatigue, substantially limits her ability to think, work, and sleep. 42 U.S.C. § 12102(2)(A); <u>Wilkie v. Lucerne County</u>, 207 F.Supp. 3d 433 (M.D. 2016) (anxiety, thinking, and sleeping are major activities). Plaintiff provides direct evidence that her situational anxiety disorder caused her to be admitted to the emergency room on multiple occasions when she was either in or leaving for Reid Park Middle School, that she took disability leave from work, and that she receives ongoing psychiatric treatment. (Doc. No. 32-5 ¶ 1-4). Plaintiff was prescribed anti-anxiety medication and pursued individual treatment with a psychotherapist. (<u>Id</u>. ¶ 3). Additionally, Plaintiff's physician, Dr. Davis, informed the school that Plaintiff should not return to Reid Park Middle School because doing so could cause Plaintiff's medical condition to worsen. (<u>Id</u>. ¶ 7; Doc. No. 32-4 at 7).

Defendant argues that Plaintiff's disability is simply the "[i]nability to work with her supervisor and/or co-workers." (Doc. No. 28-1 at 19). Defendant contends that Plaintiff must instead show that she cannot work "in a broad range of jobs" and that her "inability to perform a single, particular job [working with colleagues] does not constitute a substantial limitation in the major life activity of working [or thinking]." <u>Id.</u>; <u>see also</u> <u>Salamone v. Central Piedmont Community College</u>, 2020 WL 697842 *2-3 (W.D.N.C. 2020). Defendant states that Plaintiff presents no evidence

that she cannot work in a broad range of jobs, only that she cannot work with her colleagues at Reid Park. (Doc. No. 28-1 at 20). See <u>Metro v. Lewis Gale Clinic</u>, 2002 WL 32833260, *3 (W.D.Va. 2002); <u>see also</u> <u>Salamone</u>, 2020 WL 697842 at *2-3 (W.D.N.C. 2020). Whether the Defendant suffers impairment of a major life activity, under these facts presents an issue for determination by a jury, in light of the ADAAA and Fourth Circuit case law.

In <u>Jacobs v. N.C. Administrative Office of the Courts</u>, 780 F.3d. 562 (2015), when the plaintiff suffered social anxiety disorder and asked to work somewhere other than the courthouse front counter, the defendant argued that the plaintiff failed to show that her alleged social anxiety disorder substantially limited her ability to interact with others. The Court disagreed, explaining that prior to the ADAAA, a plaintiff seeking to prove disability needed to show that she was "significantly restricted" in a major life activity, but that the ADAAA expressly rejected this rule as imposing "too high a standard." <u>Jacobs</u>, 780 F.3d at 573 (quoting Pub.L. No 110-325 § 2(a)(8)). Rather, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." <u>Id.</u> (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). Reversing the District Court's ruling, the Fourth Circuit held that "the fact that Jacobs may have endured social situations does not *per se* preclude a finding that she had social anxiety disorder. Rather, Jacobs only needed to show that she endured situations 'with intense anxiety.'" <u>Id.</u> Therefore, the Fourth Circuit found that, "[a]t a minimum, Jacobs' testimony that working the front counter caused her extreme stress and panic

attacks create[d] a disputed issue of fact on this issue. Her testimony [was] also consistent with [her doctor's] testimony that [she] suffered from social anxiety disorder." Id.

Here, as in Jacobs, Defendant argues that Plaintiff has failed to show that she cannot work a broad range of jobs and is only asking not to work in one particular location. Prior to the ADAAA, Defendant's argument was debatable. However, as the Jacob court instructs, the standard has changed. Here, Plaintiff's multiple panic attacks, trips to the emergency room, and on-going psychiatric care clearly establish that she endured her situation with "intense anxiety." Moreover, the record allows Plaintiff to make the plausible case that her anxiety is tied to a location based on trauma experienced therein rather than being merely a clash of personalities with a supervisor, distinguishing this case from those raised by Defendant.  Plaintiff's multiple doctor notes about her condition can also be read as consistent with this position. The evidence that Plaintiff's anxiety prevents her from working in a specific location creates a disputed issue of fact reserved for the jury. Jacobs, 780 F.3d 562; see also Goonan v. Fed. Rsrv. Bank of New York, No. 12-CV-3859 JPO, 2014 WL 3610990 (S.D.N.Y. July 22, 2014) (not questioning whether anxiety based on a specific location can constitute an ADA disability); but see Salamone, 2020 WL 697842 at *3) ("Plaintiff . . . alleges only that she cannot work with her supervisors. . . . Because Plaintiff has failed to allege facts showing that she was generally foreclosed from jobs utilizing her individual skills, Plaintiff has failed to make a showing sufficient to establish that she is actually disabled.").

14

Viewing the evidence in the light most favorable to the Plaintiff and considering the broadened definition of "disability" under the ADAAA, a reasonable jury could find that that Plaintiff's situational anxiety disorder, coupled with fatigue and sleeplessness, qualifies her as disabled under the ADA.

### 2. Second Element: Whether Plaintiff Was a "Qualified Individual"

The Court turns next to the second element of the *prima facie* case: whether Plaintiff has shown that she was a qualified individual for the employment in question. "A 'qualified individual with a disability' is one 'who, with or without reasonable accommodation, can perform the essential functions' of her job." <u>E.E.O.C. v. Stowe-Pharr Mills, Inc.</u>, 216 F.3d 373, 377 (4th Cir. 2000) (quoting 42 U.S.C. § 12111(8)). Defendant argues that Plaintiff is not a "qualified individual" because she is unable to perform the essential functions of her job as an academic facilitator including being unable to work with her supervisor and colleagues. (Doc. No. 28-1 at 19).

However, Plaintiff has presented evidence that her situational anxiety disorder did not arise from an inability to work with her supervisor and co-workers, with whom she worked for several years, but rather from an assault that occurred while Plaintiff was breaking up a student fight during October 2016, potentially in combination with mounting pressure from extra duties assigned at Reid Park. Plaintiff presented a timeline that aligns with this argument, as well as affidavits from her primary care physician and her psychiatrist who both opined that Plaintiff was able in fact to return to work, but that she should "not to return to work at Reid

15

Park Academy pending further treatment." (Doc. No. 32-5: Ex. 1). Furthermore, despite Defendant's argument that Plaintiff was not able to perform the essential functions of her job, in the three years prior to her diagnosis Plaintiff apparently did not receive a negative performance review, evaluation, or written. Again, under these facts, this element is properly submitted to the jury.

### 3. Third Element: Whether Plaintiff's Disability Was the Cause of Her Termination

The Court next examines the third element of the *prima facie* case: whether Defendant fired Plaintiff because of her disability. Defendant argues that Plaintiff was discharged for "misconduct and job abandonment," and not because of any alleged disability on Plaintiff's part. (Doc. No. 31-1: Exhibit 1, CMS0536).

Plaintiff has produced affirmative evidence from which a reasonable jury could conclude that she was terminated because of her disability. Ennis v. Nat'l Ass'n of Bus. Educ. Radio, Inc., 53 F.3d 55, 59 (4th Cir. 1995). At the outset, from the beginning of Plaintiff's employment in 2013 through the middle of the 2016-2017 school year, she seems to have experienced no significant employment problems. Additionally, Plaintiff's alleged misconduct began after the October 2016 assault and the onset of her disability. Furthermore, just under two months after the assault Plaintiff met with Johnson to discuss problems Plaintiff faced at Reid Park. Drawing all reasonable inferences in Plaintiff's favor as the nonmoving party, a jury can infer that this discussion covered Plaintiff's ongoing alleged trauma and anxiety resulting from the assault. Defendant also has not produced any evidence that Plaintiff was subject to any disciplinary actions prior to the April 2, 2018, termination letter she received

16

from CMS. Thus, a reasonable jury could find that Defendant fired her because of her disability.

Plaintiff has also presented evidence that Defendant continuously claimed Plaintiff had not reported her absences, when in fact she appears to have done so. (Doc. No. 32 Ex. 10). In a September 2017 letter to CMS, Dr. Davis stated that he submitted documentation detailing Plaintiff's "disabling condition" monthly since February 2017. (Doc. No. 31 Ex. 4, Deposition Exhibits at 9). Plaintiff, sometimes via medical professionals, informed the school that she either would not, could not, or should not work at Reid Park due to her anxiety. Admittedly Plaintiff did not always do so consistently, and went through periods of not informing the school that this was the reason for her absence.  However, during these periods a reasonable jury could find that all parties understood the reasons for her absence due to Plaintiff's and her doctors' prior messages to the school. Based on these facts, the jury could agree with Plaintiff's argument that Defendant was "bound and determined" that the only place Plaintiff would work was at Reid Park.

Against this backdrop, on March 7, 2018, Plaintiff received a new return-to-work release and provided it along with a new accommodation request for relocation; yet two months later, Plaintiff was terminated without explanation beyond that she had engaged in "misconduct." In light of all events leading up to the termination, in the light most favorable to the Plaintiff, a reasonable jury could find that Plaintiff was terminated for re-affirming her disability and requesting an accommodation. Therefore, this Court finds that a reasonable jury could conclude that Plaintiff has

17

made out each of the elements of a *prima facie* case of discriminatory discharge.

### 4. McDonnell Douglas Analysis

Under the familiar McDonnell Douglas framework, once Plaintiff has presented this *prima facie* case, the burden then shifts to Defendant to produce evidence of a legitimate, non-discriminatory reason for terminating Plaintiff. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Defendant has produced evidence of a number of non-discriminatory reasons for Plaintiff's termination including "job abandonment," failure to follow CMS' policy regarding leave and reporting absences, refusal to return to work on April 9, 2018 per CMS Benefits' instruction, failure to file the correct paperwork as required by CMS regarding her absences alleged disability, and failure to ensure that her doctor filled out a medical questionnaire. Defendant has thereby satisfied the relatively modest burden of producing evidence of a legitimate, non-discriminatory reason for termination.

The burden then shifts back to Plaintiff to prove that these asserted justifications are pretextual. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). Among other methods, she may do so by demonstrating that the asserted justifications, even if true, are *post hoc* rationalizations invented for purposes of litigation. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 630, 647 (4th Cir. 2002). Plaintiff argues that Defendant's proffered reasons are pretextual because: (i) Defendant has offered different rationales at different phases of the litigation; (ii) Defendant never believed that Plaintiff was disabled in the first place; and (iii) Defendant is simply attempting to erect a barrier to Plaintiff's claim of their

18

own making. (Doc. No. 32 at 11).

The fact that an employer "has offered different justifications at different times for [an adverse employment action] is, in and of itself, probative for pretext." EEOC v. Sears Roebuck & Co., 243 F.3d 846, 852-53 (4th Cir. 2001). At the time of termination, Defendant told Plaintiff that she was being fired for "misconduct" and provided no additional explanation. (Doc. No. 32-3 at 36). Plaintiff's appeal to the Board was denied. After Plaintiff filed suit, Defendant put forth elaborated new reasons for Plaintiff's termination, including Plaintiff's failure to respond to multiple inquiries requesting documentation to support her continued absences and Plaintiff's abandonment her job when she failed to heed CMS Benefits' command "to return to work on April 9, 2018." (Doc. No. 28-1). Although these justifications are not internally inconsistent with "misconduct," they were not specifically raised at the point of termination. This point weighs in favor of Plaintiff's claim.

Moreover, many of the issues raised by Defendant potentially concern Plaintiff's ongoing disability, her use of medical leave, and her continued requests for accommodation, creating the possible inference that Defendant never believed Plaintiff had a disability in the first place. Defendant has argued in this litigation that Plaintiff does not have an ADA disability, and the parties have cited evidence that suggests Defendant believed as much at the time of the termination. For example, Defendant repeatedly pressed Plaintiff's doctors for details and additional information about why the doctors found that Plaintiff could not return to Reid Park, a fact which might lead a jury to conclude that Defendant doubted the

19

recommendations. Defendant also repeatedly directed Plaintiff to return to work at Reid Park despite Plaintiff's doctors' notes and hospital visits as a result, an act in which the jury might conclude that Defendant would not have persisted unless propelled by a doubt about Plaintiff's condition. Furthermore, there is a factual dispute over whether Defendant knew that Plaintiff suffered anxiety stemming from her October 2016 assault, as Defendant claims not to have known the root of Plaintiff's alleged disability, but was aware of the assault, met with Plaintiff soon after it happened, and received numerous communications indicating that Plaintiff should not work at that particular location. Between this factual dispute and the elaboration of Defendant's justification for Plaintiff's termination after the termination itself, Plaintiff has presented enough evidence for a jury to determine whether Plaintiff's firing was a pretext.

Drawing all reasonable inferences in favor of Plaintiff, a reasonable jury could find that Plaintiff has set out a *prima facie* case of disability discrimination and sufficient evidence of pretext to ultimately prevail on her claim. Therefore, Defendant's motion for summary judgment on Plaintiff's claim of disability discrimination is denied.

### B. Retaliation Claim

This Court next considers whether summary judgment on Plaintiff's retaliatory discharge claim is warranted. Plaintiff claims that she was terminated because she engaged in protected activity, namely, filing an EEOC complaint and requesting an accommodation for her situational anxiety disorder.

20

The ADA provides that "no [employer] shall discriminate against any individual" for engaging in protected opposition or participation activity. 42 U.S.C. § 12203(a). "In order to prevail on a claim of retaliation, a plaintiff must either offer sufficient direct or indirect evidence of retaliation, or proceed under a burden-shifting method." Rhoads v. F.D.I.C., 257 F.3d 373, 391 (4th Cir. 2001). A plaintiff need not show that she is disabled within the meaning of the ADA. See id. When proceeding under the burden-shifting method, she must show (i) that she engaged in protected activity and, (ii) because of this, (iii) her employer took adverse employment action against her. Id.

The parties do not dispute that the first and third elements are satisfied. Plaintiff engaged in protected activity by submitting a request for accommodation based on disability; and Defendant clearly took an adverse employment action for terminating her employment through "non-renewal" of her contract. As set forth below, disputed issues of material fact exist as to whether there is a causal connection between Plaintiff's protected actions and Defendant's decision to terminate Plaintiff's employment, and there is enough evidence to go to a jury on a McDonnel Douglas burden-shifting analysis.

        1. McDonnell Douglas Analysis

Plaintiff has not produced direct evidence of retaliation; however, the Court will analyze whether Plaintiff's claim can survive summary judgment under the McDonnell Douglas burden-shifting framework. Under this method of proof, Plaintiff "must show (1) that [s]he engaged in protected activity; (2) that [her] employer took

an adverse action against [her]; and (3) that a causal connection existed between the adverse activity and the protected action." Haulbrook, 252 F.3d at 706. "The employer then has the burden to 'rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions.'" Rhoads, 257 F.3d at 392 (quoting Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997)). If the employer can do so, the burden shifts back to the plaintiff to show that the proffered reason is pretext. "The plaintiff always bears the ultimate burden of persuading the trier of fact that she was the victim of retaliation." Id.

Plaintiff has established the first and second elements of the *prima facie* case through undisputed evidence. Defendant argues that Plaintiff fails to establish causation, and even if she could, CMS had a legitimate, non-discriminatory reason for the non-renewal of her contract: misconduct through failure to follow CMS' policy and job abandonment.

Plaintiff was terminated just two and a half months after filing her first EEOC complaint and renewing her accommodation request for re-location. This close temporal proximity is sufficient to establish a disputed issue of fact as to the causation element of the *prima facie* case. See Haulbrook, 252 F.3d at 706. ("[A] contested issue of fact arguably exists as to … [causation], due solely to the proximity in time of [the plaintiff's] termination on November 25 and his assertion on November 4 of a right to accommodation under the ADA."). Based on this timing and facts already discussed in the section above, a reasonable jury could determine that a causal connection existed between the protected action and the termination of her

contract.

From here, the burden-shifting inquiry proceeds just as it did with respect to Plaintiff's disability discrimination claim. For the reasons state in the Discrimination analysis, this Court finds that Defendant has presented a legitimate and non-discriminatory reason for Plaintiff's termination. However, for the reasons also stated above in the same section, a reasonable jury could then also conclude that Plaintiff was fired as a pretext for her request for an accommodation and her insistence upon it to the extent of filing an EEOC complaint. There are disputed issues of fact involved in this claim that make it appropriate to submit to the jury, and as a result summary judgment is denied.

## C. Failure to Accommodate Claim

Finally, this Court considers whether Plaintiff's failure to accommodate claim warrants summary judgment. Under the ADA, unlawful discrimination can include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ." 42 U.S.C. § 12112(b)(5)(A). For purposes of the ADA, "reasonable accommodations" may compromise "job restructuring, part-time or modified work schedules," 42 U.S.C. § 12111(9)(B), and "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment . . . ." 29 C.F.R. § 1630.2(o) (Appendix) (2011). A "failure-to-accommodate claim requires no evidence of discriminatory intent" because "[t]he failure to provide a reasonable accommodation that would not impose an undue hardship is itself the discriminatory act prohibited

by the ADA" and therefore a <u>McDonnell Douglas</u> analysis does not apply to such claims. <u>Perdue v. Sanofi-Aventis U.S., LLC</u>, No. 19-2094, 2021 WL 2324553, at \*3 n.2 (4th Cir. June 8, 2021).

Accordingly, to establish a *prima facie* case for failure to accommodate, Plaintiff must show: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." <u>Wilson v. Dollar Gen. Corp.</u>, 717 F.3d 337, 345 (4th Cir. 2013) (internal citations omitted).

For the reasons stated previously, this Court finds that Plaintiff has established a genuine dispute of fact regarding the first element of the *prima facie* case—that is, that she had a disability. As to the second element, Defendant does not dispute that it was on notice of her alleged disability.[3] <u>See</u> (Doc. Nos. 28-1; 33). The only remaining issues concern the third and fourth elements: whether a reasonable jury could find (iii) that with reasonable accommodation she could perform the essential functions of academic facilitator, and (iv) that Defendant refused to make such accommodations.

---

[3] Defendant claimed at oral argument that it did not know the specific nature of Plaintiff's claimed disability until after the commencement of this litigation because Plaintiff withheld this information. However, Defendant was aware that Plaintiff had experienced panic attacks and had presented repeated doctors' notes and emails from Plaintiff regarding her refusal or inability to return to work at Reid Park for medical reasons. <u>See, e.g.,</u> (Doc. No. 28 Ex. 1). Defendant was sufficiently on notice as to Plaintiff's disability for failure to accommodate purposes, whether or not Defendant knew all of the details regarding that disability.

24

1. Third Element: Whether with Reasonable Accommodations Plaintiff Could Perform the Essential Functions of Academic Facilitator

As to the third element, the Court begins by determining the essential functions of the position of academic facilitator. A job function is essential when "the reason the position exists is to perform that function," when there are not enough employees available to perform the function, or when the function is so specialized that someone is hired specifically because of her expertise in performing that function. 29 C.F.R. § 1630.2(n)(2). "[I]f an employer has prepared a written description before advertising or interviewing applicants for the job, the description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Other relevant evidence can include "the employer's judgment as to which functions are essential," "the amount of time spent on the job performing the function," "the consequences of not requiring the incumbent to perform the function," and the work experience of the people who hold the same or similar job. 29 C.F.R. § 1630.2(n)(3).

The written job description for the position of CMS Academic Facilitator states that an Academic Facilitator:

- Works closely with the principal to ensure successful and effective implementation of current middle school curriculum and initiatives by demonstrating leadership, knowledge, and support while creating high expectations
- Communicate effectively with teachers and administrators in your school and the central office
- . . . Design differentiated curriculum and supportive learning activities for use by classroom teachers
- Oversee all required Talent Development paperwork
- Model/demonstrate best practices in gifted education
- Lead/facilitate on-side professional development activities in gifted

25

education and other instructed areas
- Attend district meetings for Academic Facilitators
- Assist teachers in understanding implications from assessment
- Assist teachers in planning instruction based on research and instructional data from the classroom and school
- Plan instructional strategies for student from accelerated to intensive intervention based on EOG results
- Serve as coach to teachers learning new strategies
- Facilitate/monitor/coach the comprehensive reading/writing plans
- . . . Schedule Talent Development/Advanced Studies Instruction, identifying students for instructional activities, grouping students, etc.
- Organize PEP plan for Level 1 and 2 students
- Serve as a liaison between the school, Curriculum and Instruction, and the guidance counselors for the improvement of student performance

(Doc. No. 31-1 at 24). This Court also considers the undisputed evidence in the record that (i) working with a supervisor and co-workers is an essential function of the role of a CMS academic facilitator; and (ii) CMS had such openings available at one or more of their many schools in the district. Defendant has pointed to no affirmative evidence that Plaintiff's working at Reid Park in particular was an essential function of the position of a CMS Academic Facilitator, and at the very least the lack of such evidence raises a factual question on whether the location was an essential function of the role.

This Court now turns to the heart of a claim for failure to accommodate: whether a reasonable jury could find that, with a reasonable accommodation, Plaintiff could perform the essential functions of the position of academic facilitator. Wilson, 717 F.3d at 345. This inquiry proceeds in two steps: first, whether the specific accommodation requested by Plaintiff was reasonable, and second, whether Plaintiff could have performed the essential functions of the position had Defendant granted

the accommodation. Id.

A reasonable accommodation is one that "enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position." 29 C.F.R. § 1630.2(*o*)(1)(ii). The statute expressly contemplates that a reasonable accommodation may require "job restructuring." 42 U.S.C. § 12111(9)(B). In this case, Plaintiff's proposed accommodation was job relocation to one of the available positions at a different school. Defendant has not presented evidence that the requested accommodation would have caused undue hardship or would otherwise have created significant difficulties for Defendant. Cf. Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 Fed.Appx. 314, 323 (4th Cir. 2011) (noting that "an accommodation that would require other employees to work harder is unreasonable"). Therefore, a jury could conclude that Plaintiff's requested accommodation was reasonable.

Yet an employer is not required to grant even a reasonable accommodation unless it would enable the employee to perform all of the essential functions of her position if the accommodation is granted. Defendant contends that Plaintiff was unable to work with her supervisor and co-workers, that that she therefore *per se* could not perform the essential function of her position.[4] Defendant also argues that Plaintiff never fully presented the aspect of Reid Park that caused her disability and,

_____

[4] Defendant supports this argument with case law suggesting that if a Plaintiff merely cannot work with their supervisor, they are not disabled in the first case. (Doc. No. 28-1 at 20). However, without delving into these cases in detail here, the cases are cited for the proposition that Plaintiff is not disabled for ADA purposes, on which point this Court has determined that Plaintiff has presented sufficient evidence for jury determination.

27

thus, CMS could not properly re-locate her. Plaintiff replies that a transfer away from Reid Park would have eliminated the many triggers that caused her situational anxiety disorder (lingering anxiety from the 2016 assault, excess workload, and the overall workplace situation) and enabled her to meet her employer's reasonable expectations.

Defendant's argument fails for summary judgment purposes because a reasonable jury could find that Plaintiff's situational anxiety disorder would not have interfered with her essential job functions if her proposed accommodation – to keep the same role in a different CMS school – had been granted. Until the 2016 assault, Plaintiff had performed her position at Reid Park for several years without significant issue. Plaintiff's ability to "work[] closely with the principal," "communicat[e] effectively with teachers and administrators in the school and central office," "serv[e] as coach to teachers learning new strategies," and "serve as a liaison between the school, Curriculum and Instruction, and the guidance counselors," (Doc. No. 31-1 at 24), although later questioned, were not in dispute until after the assault. A jury could therefore attribute Plaintiff's apparent inability to perform any of the essential job functions (in particular, working closely with the principle and communicating effectively) to Plaintiff's Reid-Park-related anxiety disability rather than a genuine inability to perform these functions. If the jury did determine as much, it could also conclude that the disability would not prevent Plaintiff from performing these essential functions if she were placed in the same role but at a different CMS school. Therefore, this Court concludes that Plaintiff established a genuine dispute of fact as

to whether, with a reasonable accommodation, she could perform all essential functions of the academic facilitator position.

## 2. Fourth Element: Good-Faith Duty

As to the fourth element of a reasonable accommodation claim, "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation" that "identif[ies] the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3); Haneke v. Mid–Atlantic Capital Mgmt., 131 Fed.Appx. 399, 399–400 (4th Cir. 2005) (unpublished) (finding that "[i]mplicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation"); Wilson, 717 F.3d at 346 (employers have a good-faith duty "to engage [with their employees] in an interactive process to identify a reasonable accommodation."). This duty is triggered when an employee communicates her disability and desire for an accommodation— even if the employee fails to identify a specific, reasonable accommodation. Wilson, 717 F.3d at 346. An employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position. Id. at 347; see also Deily v. Waste Mgmt. of Allentown, 55 Fed.Appx. 605, 607 (3d. Cir. 2003). Courts have held that failure to "discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment

action" against a disabled employee is evidence of bad faith. Rorrer v. City of Stow, 743 F.3d 1025, 1040 (6th Cir. 2014) (citing EEOC v. Chevron Phillips Chem. Co., 570 F.3d 606, 622 (5th Cir. 2009)).

Defendant argues that the Plaintiff did not engage in this interactive process in good faith, as despite the fact that CMS requested meetings and information from Hampton regarding her disability, Hampton failed to provide such information and instructed her physician to limit the information provided to CMS. (Doc. No. 28-1 at 23). Although Plaintiff agrees that the interactive process was "less than perfect," Plaintiff argues that Defendant's hands were not clean in the process either; specifically, Plaintiff argues that Defendant's intransigence despite the doctors' opinions shows Defendant was determined to have Plaintiff work at Reid Park and was not engaging in good faith accommodation discussions, that Defendant's argument ignores Defendant's knowledge of the medical opinions at the time, and that Defendant did not engage in a flexible process. (Doc. No. 32 at 9–10).

Both sides present sufficient evidence to go to a jury on this question to determine who was more at fault. On the one hand, a jury could read the record to reflect that Plaintiff engaged in bad faith. Plaintiff repeatedly missed meetings with Defendant and did not provide CMS with an expected return-to-work date. (Doc. No. 28-4, Johnson Dep. at 46).[5] Additionally, Plaintiff informed her doctor's office that they could speak with CMS but instructed the doctor to "limit the info" shared, "just talk about the environment of the job," and to inform Defendant that "she is able to

---

[5] Plaintiff did provide CMS with a full HIPAA release.

do her job, but you know the condition that it caused her." (Doc. No. 31-2, Atrium Records 0001541-1542). On the other hand, a jury might find that Defendant's actions warranted Plaintiff's response and that Defendant engaged in bad faith by ignoring three different doctor's notes opining that Plaintiff could not return to Reid Park because it could cause her condition to worsen, and in never attempting to re-locate Plaintiff to one of the many schools in the CMS district despite her repeated requests. A jury could also find that Defendant falsely claimed that Plaintiff failed to report her absences and that she had been over-paid; this, despite monthly medical certifications from Plaintiff's primary care physician and psychiatrist who both opined that Plaintiff was able to return to work, but that she should "not to return to work at Reid Park Academy pending further treatment." (Doc. No. 31 Ex. 4, Deposition Exhibits at 9; Doc. No. 32-3 at 9). From these facts, a reasonable jury could conclude that Defendant engaged in the interactive process in bad faith.

Therefore, this Court will Plaintiff's accommodation claim to the jury and deny summary judgment.

## IV.  CONCLUSION

Claims involving the Americans with Disabilities Act are often fact intensive and warrant a case-by-case analysis. J.D. by Doherty v. Colonial Williamsburg Found., 925 F.3d 663, 675 (4th Cir. 2019). In this case, there are genuine issues of material fact underlying each of Plaintiff's claims that would be more appropriately submitted to a jury than determined at summary judgment.

**IT IS, THEREFORE, ORDERED** that:

31

1. Defendant's Motion for Summary Judgment, (Doc. No. 28), is **DENIED**; and

2. The trial will take place in the Court's July civil term; a status conference to discuss the same will be scheduled promptly.

   **SO ORDERED**.

Signed: June 9, 2021

Robert J. Conrad, Jr.
United States District Judge